IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA17-882

Filed: 15 May 2018

Cabarrus County, No. 16 CVS 2281

N.C. DEPARTMENT OF ENVIRONMENTAL QUALITY, DIVISION OF WASTE
MANAGEMENT, Petitioner,

v.

TRK DEVELOPMENT, LLC, Respondent.

Appeal by petitioner from order entered 26 January 2017 by Judge Julia Lynn
Gullett in Cabarrus County Superior Court. Heard in the Court of Appeals 21 March
2018.

> *Attorney General Joshua H. Stein, by Assistant Attorney General T. Hill Davis,
> III, for petitioner.*

> *Hartsell & Williams, PA, by Andrew T. Cornelius and Austin "Dutch" Entwistle
> III, for respondent.*

DAVIS, Judge.

This case requires us to determine whether the North Carolina Department of
Environmental Quality ("DEQ") was properly estopped from enforcing the Solid
Waste Management Act against a developer based on the developer's prior receipt of
an erosion and sedimentation control permit from DEQ. Because we conclude that
both the administrative law judge and the trial court erred in their application of the
equitable estoppel doctrine in favor of the developer on these facts, we reverse.

N.C. Dep't of Envtl. Quality v. TRK Dev., LLC

*Opinion of the Court*

**Factual and Procedural Background**

At all times relevant to this appeal, TRK Development, LLC ("TRK") owned three adjoining parcels of land in Concord, North Carolina. In April 2014, TRK sought to make a structural addition to a warehouse located on the first parcel. The planned addition required that a substantial amount of soil be excavated from the second parcel. Prior to beginning construction, TRK hired surveyors, an architect, and a civil engineer to prepare an erosion and sedimentation control plan to be submitted to DEQ for approval.[1]

On 18 June 2014, Dale Fink, the civil engineer hired by TRK, submitted the completed erosion and sedimentation control plan to Tamara Eplin, an assistant regional engineer in the Land Quality Section of DEQ.[2] Included in the plans were topographic maps containing the results of soil boring testing conducted by TRK at the proposed construction site. The borings indicated the presence of trash in multiple locations beneath the surface of the soil TRK intended to excavate.

---

[1] At the time the erosion and sedimentation control plan was submitted, DEQ was known by its former name, the Department of Environment and Natural Resources.

[2] DEQ is comprised of eleven divisions, which are in turn subdivided into sections. The departments within DEQ relevant to this appeal are: (1) the Division of Energy, Land, and Mining Resources, which contains the Land Quality Section; and (2) the Division of Waste Management, which encompasses the Solid Waste Section.

The Land Quality Section approved TRK's erosion and sedimentation control plan by issuing a Letter of Approval and Certificate of Plan Approval on 26 June 2014. The Letter of Approval contained the following language:

> If, following the commencement of this project, the erosion and sedimentation control plan is inadequate to meet the requirements of the Sedimentation Pollution Control Act of 1973 . . . this office may require revisions to the plan and implementation of the revisions to insure compliance with the Act.
>
> Acceptance and approval of this plan is conditioned upon your compliance with Federal and State water quality laws, regulations, and rules. In addition, local city or county ordinances or rules may also apply to this land-disturbing activity. *This approval does not supersede any other permit or approval.*

(Emphasis added.)

On 18 August 2014, Fink submitted an amended erosion and sedimentation control plan to Eplin that was specifically for the "spoils area" where excavated soil would be placed. DEQ approved TRK's second erosion and sedimentation control plan on 26 August 2014 by issuing another Letter of Approval and Certificate of Plan Approval. The 26 August Letter of Approval contained the same above-quoted language as the 26 June Letter of Approval.

After receiving these approvals, TRK began construction on the warehouse addition in September 2014. On 18 September 2014, an inspector with the Land

Quality Section conducted an inspection of the construction site and determined that

it was in compliance with the Sedimentation Pollution Control Act of 1973.[3]

On 23 November 2014, DEQ received an anonymous letter stating, in pertinent

part, as follows:

> In the area of Ramdin Court and Cascade Drive in Concord, NC there seems to be some activity taking place that basically is leaving the area looking like a landfill. . . . There is some sort of grading taking place that is uncovering what appears to be a massive area of buried trash and garbage. There is all kind of trash and also rank odors. It has been spread across a large area near a creek and near power lines. . . . We would appreciate it if you can help look into this matter. If this is not a matter you are responsible for, please forward it [to] the appropriate department. You are the only place I could think of that handles this sort of thing.

In response to the letter, Teresa Bradford, an environmental senior specialist

working in the Solid Waste Section of DEQ's Division of Waste Management,

conducted a site inspection of the construction area on 3 December 2014. During the

inspection, she observed "waste being moved from one area to the next[.]" Bradford

spoke with TRK's main contractor, Brandon Cornelius, who told her that TRK

possessed the necessary permits for its construction project. Cornelius showed

Bradford one of the Certificates of Plan Approval that TRK had received from the

Land Quality Section of DEQ. Bradford explained that this approval had been given

---

[3] N.C. Gen. Stat. § 113A-50, *et seq.* (2017).

"for erosion and sediment control measures only" and not "to dispose [of] solid waste on the [third] parcel." While at the site, Bradford also spoke by phone with Rishi Kapadia, a member manager of TRK. She advised Kapadia that TRK's permit "was approval for erosion control measures only" and that she "wasn't aware of any solid waste permit that would allow for the disposal."

On the following day, Bradford informed Kapadia that TRK had not been issued a permit allowing it to dispose of solid waste on its property. She further told Kapadia that — for this reason — the waste that had already been excavated would have to be taken to a permitted landfill and that, similarly, "any waste continuing to be removed from the original location would have to be disposed of at [a permitted] landfill." Kapadia responded that doing so would cost "millions of dollars."

Bradford conducted a second site inspection on 16 December 2014 and saw that waste was continuing to be disposed of on the third parcel. She further observed that the waste area had increased in size since her first inspection from one acre to approximately 1.7 acres and from ten feet in height to between twenty and thirty feet.

On 29 December 2014, DEQ issued a Notice of Violation to TRK, which stated that TRK was "operating a non-conforming solid waste disposal site/open dump" in violation of four separate North Carolina Administrative Code regulations related to

the disposal of solid waste.[4] The Notice of Violation also provided that TRK had sixty days in which to come into compliance with these regulations by taking certain specified actions, including that it refrain from disposing of any additional waste on TRK's third parcel and that it remove "all solid waste from the site including any that may be buried and properly dispose of it in a facility permitted by the Division of Waste Management."

DEQ received no response from TRK, and Bradford conducted another site inspection on 29 January 2015. During this inspection, she "observed that the [waste] area had increased in height and also that there was an additional area to the east of the disposal area that had been excavated and waste was being placed into the excavated area."

Following this inspection, a meeting was scheduled at the DEQ Mooresville Regional Office between Kapadia, Bradford, and Charles Gerstell, another environmental senior specialist in the Solid Waste Section. At the meeting, Kapadia

---

[4] The specific regulations listed in the Notice of Violation as having been violated by TRK were 15A N.C.A.C. 13B .0106(a) and (b), and 15A N.C.A.C. 13B .0201(a) and (b). Rule 13B .0106(a) provides that "[a] solid waste generator shall be responsible for the satisfactory storage, collection and disposal of solid waste." 15A N.C.A.C. 13B .0106(a) (2017). Rule 13B .0106(b) states that "[t]he solid waste generator shall ensure that his waste is disposed of at a site or facility which is permitted to receive the waste." 15A N.C.A.C. 13B .0106(b). Rule 13B .0201(a) provides that "[n]o person shall treat, process, store, or dispose of solid waste . . . except at a solid waste management facility permitted by the Division for such activity[.]" 15A N.C.A.C. 13B .0201(a) (2017). Rule 13B .0201(b) states that "[n]o person shall cause, suffer, allow, or permit the treatment, storage, or processing of solid waste upon any real or personal property owned, operated, leased, or in any way controlled by that person without first obtaining a permit for a solid waste management facility from the Division authorizing such activity[.]" 15A N.C.A.C. 13B .0201(b). Each of these regulations was promulgated pursuant to North Carolina's Solid Waste Management Act.

reiterated his view that TRK had already obtained the necessary permits for its construction project. Bradford informed Kapadia that "the only solution was removal of the waste, but [that] the section would work with him on technical assistance for removal and disposal options and . . . a time line for a cleanup for the site."

On 27 February 2015, TRK sent a letter to DEQ responding to the Notice of Violation. The letter stated, in pertinent part, as follows:

> In response to your notice sent December 29, 2014, TRK Development respectfully disagrees with [DEQ's] assessment that site work . . . involves the excavation, transportation and/or disposal of solid waste. We believe that that material being transported consists of mostly soil/dirt and is in line with the definition of spoils as stated in the approved plans and Certificate of Plan Approval issued by [DEQ]. . . .
>
> We propose that we will leave the spoils in place as is, seed and mulch the area and add additional security measures such as a gate to secure the site.

DEQ issued a Notice of Continuing Violation to TRK on 17 March 2015 along with an accompanying letter informing TRK that it had thirty days in which to come into compliance with the applicable regulations. After the thirty-day deadline passed, Bradford returned to the site on 12 May 2015 with four other DEQ employees to conduct soil sampling. The laboratory results of this sampling indicated the presence of both semi-volatile organic compounds and metals (including arsenic and aluminum) in the soil at levels hazardous to human health.

On 23 July 2015, DEQ issued a Compliance Order With Administrative Penalty to TRK "because of certain violations of the North Carolina Solid Waste Management Act (N.C. General Statute 130A, Article 9) and of the North Carolina Solid Waste Management Rules (15A N.C. Administrative Code 13B) which implements [sic] the Act." The compliance order alleged violations of the same four regulations that had been listed in the Notice of Violation and Notice of Continuing Violation previously issued to TRK by DEQ. It also assessed an administrative penalty of $14,287.13.

TRK filed a petition for a contested case hearing with the Office of Administrative Hearings on 8 September 2015. Following a hearing, Administrative Law Judge ("ALJ") David F. Sutton issued a final decision on 11 July 2016 that "overruled and reversed" the 23 July 2015 compliance order issued by DEQ. In his decision, the ALJ determined, *inter alia*, that TRK was, in fact, a solid waste generator and did not come within the exception set out in the Solid Waste Management Act for "the management of solid waste that is generated by an individual . . . on the individual's property and is disposed of on the individual's property." However, the ALJ further concluded that DEQ was estopped from issuing a compliance order against TRK based on its prior issuance of approvals for the erosion and sedimentation control plans submitted by TRK.

N.C. Dep't of Envtl. Quality v. TRK Dev., LLC

*Opinion of the Court*

On 8 August 2016, DEQ filed a petition for judicial review of the ALJ's final decision in Cabarrus County Superior Court. The Honorable Julia Lynn Gullett entered an order on 26 January 2017 affirming the ALJ's final decision. DEQ filed a notice of appeal to this Court on 23 February 2017.

**Analysis**

Judicial review of an administrative decision is governed by Chapter 150B of the North Carolina General Statutes, which provides, in pertinent part, as follows:

> (b) The Court reviewing a final decision may affirm the decision or remand the case for further proceedings. It may also reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the findings, inferences, conclusions, or decisions are:
>
> (1) In violation of constitutional provisions;
>
> (2) In excess of the statutory authority or jurisdiction of the agency or administrative law judge;
>
> (3) Made upon unlawful procedure;
>
> (4) Affected by other error of law;
>
> (5) Unsupported by substantial evidence admissible under G.S. 150B-29(a), 150B-30, or 150B-31 in view of the entire record as submitted; or
>
> (6) Arbitrary, capricious, or an abuse of discretion.

N.C. Gen. Stat. § 150B-51(b) (2017).

It is well settled that "in cases appealed from administrative tribunals, questions of law receive *de novo* review, whereas fact-intensive issues such as

sufficiency of the evidence to support an agency's decision are reviewed under the whole-record test." *N.C. Dep't of Env't & Nat. Res. v. Carroll*, 358 N.C. 649, 659, 599 S.E.2d 888, 894 (2004) (citation, quotation marks, and brackets omitted). "The whole record test requires the reviewing court to examine all competent evidence (the whole record) in order to determine whether the agency decision is supported by substantial evidence." *Fehrenbacher v. City of Durham*, 239 N.C. App. 141, 146, 768 S.E.2d 186, 191 (2015) (citation and quotation marks omitted).

Our Supreme Court has stated that "where only one inference can reasonably be drawn from undisputed facts, the question of estoppel is one of law for the court to determine." *Hawkins v. M & J Fin. Corp.*, 238 N.C. 174, 185, 77 S.E.2d 669, 677 (1953) (citation omitted). However, where "the evidence bearing on the issue of estoppel [is] conflicting and susceptible of diverse inferences[,]" the issue is a mixed question of fact and law. *Bowling v. Combs*, 60 N.C. App. 234, 241, 298 S.E.2d 754, 758 (citation omitted), *disc. review denied*, 307 N.C. 696, 301 S.E.2d 389 (1983).

On appeal, DEQ contends that the trial court erred in affirming the final decision of the ALJ for two reasons: (1) the doctrine of equitable estoppel cannot operate so as to impair the State's exercise of its governmental powers; and (2) the elements of equitable estoppel were not met in this case. We agree with both of DEQ's arguments.

## I. Equitable Estoppel as a Limit on the Exercise of Governmental Powers

DEQ first contends that the trial court erred in affirming the final decision of the ALJ because a State agency's ability to exercise its governmental powers cannot be impaired by the operation of estoppel. DEQ asserts that its duty to enforce the Solid Waste Management Act constitutes a police power as to which ordinary principles of estoppel do not apply.

It is well established that an administrative agency of the State "is not subject to an estoppel to the same extent as a private individual or a private corporation." *Meachan v. Montgomery Cty. Bd. of Educ.*, 47 N.C. App. 271, 279, 267 S.E.2d 349, 354 (1980) (citation omitted). Our appellate courts have made clear that estoppel "may not arise against a governmental entity if such estoppel will impair the exercise of the governmental powers of the entity." *Wallace v. Bd. of Tr.*, 145 N.C. App. 264, 277, 550 S.E.2d, 552, 560 (citation omitted), *disc. review denied*, 354 N.C. 580, 559 S.E.2d 553 (2001).

The Solid Waste Management Act states, in pertinent part, as follows:

> (a) For the purpose of promoting and preserving an environment that is conducive to public health and welfare, and preventing the creation of nuisances and the depletion of our natural resources, the Department shall maintain a Division of Waste Management to promote sanitary processing, treatment, disposal, and statewide management of solid waste and the greatest possible recycling and recovery of resources, and the Department shall employ and retain qualified personnel as may be necessary to effect such purposes. . . .

> (b)  In furtherance of this purpose and intent, it is hereby determined and declared that it is necessary for the health and welfare of the inhabitants of the State that solid waste management facilities permitted hereunder and serving a specified geographic area shall be used by public or private owners or occupants of all lands, buildings, and premises within the geographic area.  Actions taken pursuant to this Article shall be deemed to be acts of the sovereign power of the State of North Carolina[.]

N.C. Gen. Stat. § 130A-291 (2017).  It is clear that DEQ's responsibility for enforcing the Act — along with the provisions of the North Carolina Administrative Code promulgated thereunder — directly invokes its core governmental powers.

Our Supreme Court recognized the inability of a city to be estopped from exercising its governmental authority in *City of Raleigh v. Fisher*, 232 N.C. 629, 61 S.E.2d 897 (1950).  In that case, the defendants were allowed to operate a bakery within an area zoned for residential use with the knowledge of city officials for over ten years.  *Id.* at 632, 61 S.E.2d at 900.  During that time period, the defendants both increased their business operations and invested substantial amounts of money into the bakery.  When the city later sought to enforce its zoning regulations against them, the defendants argued that the city was estopped from doing so "because its officials ha[d] encouraged and permitted such conduct for at least ten years."  *Id.*  In rejecting the defendants' argument, the Supreme Court stated the following:

> In enacting and enforcing zoning regulations, a municipality acts as a governmental agency and exercises the police power of the State.  The police power is that

N.C. Dep't of Envtl. Quality v. TRK Dev., LLC

*Opinion of the Court*

> inherent and plenary power in the State which enables it to govern, and to prohibit things hurtful to the health, morals, safety, and welfare of society. In the very nature of things, the police power of the State cannot be bartered away by contract, or lost by any other mode.

*Id*. at 635, 61 S.E.2d at 902 (internal citations omitted). As a result, the Court held that the city could not be estopped from enforcing its zoning ordinances against the defendants despite the longstanding acquiescence of city officials to the defendants' zoning violations prior to beginning enforcement efforts. *Id*.[5]

This principle was also applied in *Mecklenburg County v. Westbery,* 32 N.C. App. 630, 233 S.E.2d 658 (1977), which involved a mistakenly issued zoning permit that was later revoked by the county after the defendants had "incurred a substantial expense in good faith reliance upon [the] permit before it was revoked[.]" *Id.* at 635, 233 S.E.2d at 661. Citing *Fisher*, this Court held that the county could not be estopped from revoking the permit because "the planned usage was illegal from its inception" and "a contrary decision would require an acceptance of the paradoxical proposition that a citizen can acquire immunity to the law of his country by habitually violating such law with the consent of unfaithful public officials charged with the

---

[5] TRK argues that *Fisher* was later distinguished by this Court's decision in *City of Winston-Salem v. Hoots Concrete Company, Inc.*, 37 N.C. App. 186, 245 S.E.2d 536, *disc. review denied*, 295 N.C. 645, 248 S.E.2d 249 (1978). However, *Hoots* dealt with the question of whether or not a zoning officer had issued a building permit in accordance with applicable zoning regulations. *Id.* at 189, 245 S.E.2d at 538. In our opinion, we expressly stated that our decision was not in conflict with "the principle of law set out in . . . *Fisher*" and that if the zoning permit had, in fact, been issued in error "the city cannot be estopped to enforce its zoning ordinance under an appropriate interpretation of the ordinance." *Id*. at 190, 245 S.E.2d at 538.

duty of enforcing it." *Id.* (citation and quotation marks omitted). *See also Kings Mountain Bd. of Educ. v. N.C. State Bd. of Educ.*, 159 N.C. App. 568, 578, 583 S.E.2d 629, 636 (2003) (holding that State Board of Education could not be estopped from approving school merger where "application of the estoppel doctrine would impede the State Board from exercising its legislative power to approve or deny school mergers").

In arguing that the application of estoppel in the present case would not impair the exercise of DEQ's governmental powers, TRK attempts to rely upon *County of Wake v. North Carolina Department of Environment & Natural Resources*, 155 N.C. App. 225, 573 S.E.2d 572 (2002), *disc. review denied*, 357 N.C. 62, 579 S.E.2d 387 (2003), and *Fike v. Board of Trustees*, 53 N.C. App. 78, 279 S.E.2d 910, *disc. review denied*, 304 N.C. 194, 285 S.E.2d 98 (1981). Both cases, however, are inapposite.

*County of Wake* concerned a dispute between the Town of Holly Springs and Wake County over the siting of a landfill. Holly Springs initially approved the proposed landfill site and accepted compensation from Wake County before revoking its approval years later. *Cty. of Wake*, 155 N.C. App. at 230, 573 S.E.2d at 577. We held that Holly Springs was estopped from reneging on its agreement with Wake County because "[t]o allow the Town to withdraw its approval . . . would be inequitable under the circumstances." *Id.* at 241, 573 S.E.2d at 584. The dispute in

that case, however, was purely contractual as no evidence was presented showing that any statute or regulation was violated by the siting of the landfill.

In *Fike*, a state employee sought to compel the State Employees' Retirement System to provide him with disability retirement benefits. *Fike*, 53 N.C. App. at 79, 279 S.E.2d at 912. This Court ruled that the Retirement System was estopped from denying benefits to the employee where the Retirement System made representations that the employee's personnel officer would assist him with the proper execution of the correct forms for obtaining benefits, but the personnel officer failed to do so. *Id.* at 81, 279 S.E.2d at 913. Like *County of Wake*, the dispute in *Fike* did not concern the exercise of a police power by a governmental entity. Indeed, we expressly noted that "application of principles of estoppel in the present case would not impair the exercise of [the Retirement System's] governmental powers." *Id.* at 82, 279 S.E.2d at 913.

Here, the ALJ's findings established that TRK was in violation of the Solid Waste Management Act. It is beyond dispute that the Act serves important interests in terms of regulating "in the most economically feasible, cost-effective, and environmentally safe manner the storage . . . and disposal of solid waste in order to protect the public health, safety, and welfare; enhanc[ing] the environment for the people of this State; and recover[ing] resources which have the potential for further usefulness." N.C. Gen. Stat. § 130A-309.03(b)(1) (2017). Moreover, as noted earlier,

the Act specifically provides that "[a]ctions taken pursuant to this Article shall be deemed to be acts of the sovereign power of the State of North Carolina[.]" N.C. Gen. Stat. § 130A-291.

Thus, DEQ's duty to enforce the Solid Waste Management Act and its accompanying regulations epitomizes the type of core police power possessed by a government agency that cannot be impaired by estoppel. Accordingly, on this ground alone, the trial court erred in affirming the final decision of the ALJ.

## II. Elements of Equitable Estoppel

The ALJ and the trial court also erred in their application of the elements of equitable estoppel to these facts. Therefore, we deem it appropriate to address this issue as well.

It is helpful at the outset to review basic principles regarding equitable estoppel.

> [T]he essential elements of an equitable estoppel as related to the party estopped are: (1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is reasonably calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party afterwards attempts to assert; (2) intention or expectation that such conduct shall be acted upon by the other party, or conduct which at least is calculated to induce a reasonably prudent person to believe such conduct was intended or expected to be relied and acted upon; (3) knowledge, actual or constructive, of the real facts. As related to the party claiming the estoppel, they are: (1) lack of knowledge and the means of knowledge of the truth as to the facts in

question; (2) reliance upon the conduct of the party sought to be estopped; and (3) action based thereon of such a character as to change his position prejudicially.

*Hawkins*, 238 N.C. at 177-78, 77 S.E.2d at 672 (citation omitted).

This Court has held that "mere silence will not operate to create an estoppel. In order to work an estoppel the silence must be under such circumstances that there are both a specific opportunity, and a real or apparent duty, to speak." *Neal v. Craig Brown, Inc.*, 86 N.C. App. 157, 164, 356 S.E.2d 912, 916 (internal citations, quotation marks, and brackets omitted), *disc. review denied*, 320 N.C. 794, 361 S.E.2d 80 (1987). Furthermore, "[w]hen a party is misled through his own lack of diligence and reasonable care, he may not then avail himself of the doctrine of equitable estoppel." *N.C. Fed. Sav. & Loan Ass'n v. Ray*, 95 N.C. App. 317, 323, 382 S.E.2d 851, 855 (1989) (citation omitted). Finally, it is a well-established principle that "everyone is equally capable of determining the law, is presumed to know the law and . . . cannot be deceived by representations concerning the law or [be] permitted to say he or she has been misled." *Dalton v. Dalton*, 164 N.C. App. 584, 586, 596 S.E.2d 331, 333 (2004) (citation omitted).

In the present case, TRK submitted plans on 18 June 2014 to the Land Quality Section for the sole purpose of seeking approval for an erosion and sedimentation control plan. Based upon these submissions, the Land Quality Section issued

documentation containing the limited and specific approval TRK had sought.[6]  The Letter of Approval explicitly stated that "[t]his approval does not supersede any other permit or approval."

Despite the fact that the approval documents did not in any way mention the issue of solid waste disposal, TRK nevertheless contends that DEQ's approval of the erosion and sedimentation control plan should be deemed to be a representation by DEQ that TRK's project was — and would continue to be — in full compliance with the Solid Waste Management Act.  This argument lacks merit.

The Letters of Approval and Certificates of Plan Approval issued by the Land Quality Section were, by their express terms, limited to the erosion and sedimentation control plan submitted by TRK and merely signified the compliance of the plan with the Sedimentation Pollution Control Act.  None of the language appearing in these documents can be read as amounting to a declaration by DEQ that its approval of the erosion and sedimentation control plan also constituted approval of *other* aspects of TRK's construction project.

TRK also argues that the soil boring markers on the plans it submitted to the Land Quality Section indicated the presence of trash beneath the surface of the proposed excavation site and therefore (1) provided DEQ with knowledge of the necessity for TRK to obtain a solid waste permit; and (2) triggered an obligation on

---

[6] We note that TRK does not allege that DEQ has ever attempted to revoke its prior approval of the erosion and sedimentation control plan submitted by TRK.

the part of the Land Quality Section to refer the application to the Division of Waste Management. This argument fails for several reasons.

First, to the extent that the soil boring markers provided DEQ with any indication of the eventual necessity for TRK to obtain a solid waste permit, such knowledge could be equally imputed to TRK, which was the entity ultimately responsible for ensuring that its project complied in all respects with North Carolina law. Second, while coordination among different sections of a state agency in appropriate circumstances is desirable, TRK has cited no legal authority suggesting that the Land Quality Section was somehow *required* as a matter of law to refer TRK's erosion and sedimentation control plan to the Solid Waste Section.

Finally, it is clear that TRK was not actually in violation of the Solid Waste Management Act at the time DEQ gave its approval for TRK's erosion and sedimentation control plan. Instead, TRK only began violating the Solid Waste Management Act once it actually started excavating and disposing of solid waste on its property. Thus, in essence, TRK is making the novel argument that DEQ should be estopped based on its failure to foresee a *future* violation of the statute by TRK. TRK has failed to explain why DEQ was legally required to assume that as the project moved forward TRK would proceed to dispose of this trash in a manner that was unlawful under the Solid Waste Management Act.

In sum, at no point was there any valid basis for TRK to believe that the documentation it had previously received from the Land Quality Section meant anything more than that its erosion and sedimentation control plan had been approved. Consequently, TRK's claimed reliance upon this limited approval as a basis for believing it could lawfully proceed to excavate and dispose of 1.7 acres of solid waste without a solid waste permit in violation of the Solid Waste Management Act was manifestly unreasonable. In actuality, TRK was misled only by its "own want of reasonable care and circumspection." *Peek v. Wachovia Bank & Tr. Co.*, 242 N.C. 1, 12, 86 S.E.2d 745, 753 (1955) (citation omitted).

## Conclusion

For the reasons stated above, we reverse the trial court's 26 January 2017 order and remand for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.

Judges STROUD and ARROWOOD concur.